### UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division


SAMUEL NATHANIEL KEARSON,

        Plaintiff,

v.                                                                          Civ. No. 2:15cv172

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

        Defendant.


### UNITED STATES MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

        Plaintiff, Samuel Nathaniel Kearson ("plaintiff" or "Kearson"), brought this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Acting Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying Kearson's claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act. 42 U.S.C. §§ 401-434.

        An order of reference, dated July 28, 2015, assigned this matter to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72. ECF No. 5. For the foregoing reasons, this Court recommends that plaintiff's motion for summary judgment (ECF No. 9) be DENIED, defendant's motion for summary judgment (ECF No. 12) be GRANTED, and the decision of the Commissioner be AFFIRMED.

# I. PROCEDURAL BACKGROUND

Plaintiff, Samuel Kearson, protectively filed a Title II application for a period of disability and DIB on February 5, 2014, alleging disability beginning on August 1, 2013. R. 15.[1] The claim was initially denied on April 24, 2014, and upon reconsideration on May 15, 2014. R. 62-71, 72-81. At Kearson's request, an Administrative Law Judge ("ALJ") heard the matter on October 27, 2014, and at that hearing received testimony from Kearson (who was represented by counsel) and an impartial vocational expert ("VE"). R. 29-62. As discussed below, the ALJ found that Kearson was not disabled within the meaning of the Social Security Act. *Id.*

On December 12, 2014, the Appeals Council denied Kearson's request for review of the ALJ's decision. R. 6-8. Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481. Having exhausted all administrative remedies, Kearson filed a complaint with this Court on April 22, 2015. ECF No. 1. The Commissioner filed an answer on July 10, 2015. ECF No. 3. In response to the Court's order, the parties filed motions for summary judgment, with supporting memoranda, on September 10 and October 6, 2015, respectively. ECF Nos. 9-10, 12-13. As neither party has indicated special circumstances requiring oral argument, the case is deemed submitted for a decision.

# II. RELEVANT FACTUAL BACKGROUND

## A. *Kearson's Background*

Kearson was born in 1970 and was 43 years old on August 1, 2013, the onset date of his alleged disability. R. 24. Kearson completed high school and previously worked as a truck driver, correctional officer, an enlisted member of the United States Army, and a defense

---

[1] Page citations are to the administrative record previously filed by the Commissioner.

contractor. R. 34-38. Kearson reports that he suffers from post-traumatic stress disorder ("PTSD"), traumatic brain injury residuals, post-concussion problems, thoracic strain, lumbar strain, migraines, sleep apnea, pelvic stress, vertigo, residuals of a wrist injury, and insomnia. R. 63, 71. Kearson contends that these conditions are disabling, rendering him incapable of work as of August 1, 2013. R. 63.

**B.**     ***Medical Record Prior to the August 1, 2013 Alleged Onset Date***

On February 19, 2010, Kearson was seen by Dr. Edwin Malixi for pelvic pain that had been occurring since 2004 due to a stress fracture in Kearson's left pelvic bone. R. 527. The pain was intermittently sharp, on and off, worse with heavy lifting and prolonged standing, and rated at a severity of 6/10. *Id.* At the time, Kearson had migraine headaches that he was treating with Tylenol, and was being seen in the mental health clinic for depression. *Id.*

On July 23, 2010, Kearson was seen by Dr. Emelita Ramos ("Dr. Ramos") for medication management and supportive psychotherapy. R. 521-26. The meeting lasted thirty minutes. R. 521. Kearson had just returned from Iraq, on July 15, 2010, and was experiencing depression. R. 522. He was experiencing difficulty trusting and talking to people, as well as trouble sleeping, lack of motivation, and loss of appetite. R. 522-23. He was in a depressed mood with a sad affect, and he spoke of his recent experience in Iraq as a defense contractor. R. 523. At the time, Kearson was working full-time as a defense contractor. *Id.* Dr. Ramos reported Kearson as cooperative, alert, and oriented x3. *Id.* His speech was coherent and relevant with a normal rate and tone, and he exhibited good eye contact. *Id.* Dr. Ramos diagnosed Kearson with PTSD and ordered that Kearson attend a PTSD group meeting once a week beginning August 3, 2010. *Id.* Both a primary care PTSD ("PC PTSD") and a PTSD checklist – civilian ("PCL–C")

3

screening came back positive.[2]  *Id.*  Dr. Ramos prescribed venlafaxine for Kearson's depression and anxiety and Ambien to help him sleep.  *Id.*

After attending the PTSD group, Kearson presented to psychiatry resident Gregory Carr ("Dr. Carr") on August 5, 2010.  R. 520.  Dr. Carr noted that Kearson was an active member of the group, related well to others, and appeared to be responding positively to the overall group experience.  *Id.*  Kearson again attended the PTSD group meeting on August 17, 2010.  R. 518. On August 20, 2010, Tonia Bigby, Psy.D ("Dr. Bigby"), observed that Kearson became tearful and emotionally distraught as he shared his difficulty with transitioning back into normal life.  R. 519.  She also noted that Kearson was insightful and receptive to feedback.  *Id.*

Dr. Ramos again saw Kearson on September 20, 2010, for medication management and supportive psychotherapy.  R. 515-18.  Kearson was still taking venlafaxine and Ambien.  R. 515-16.  He continued to be depressed and reported having flashbacks and nightmares every day about his experiences in Iraq and Afghanistan.  R. 516.  He denied having any active thoughts of killing himself.  *Id.*  He talked about being forgetful and unable to finish tasks as he was losing confidence in himself.  *Id.*  He was able to sleep, but would wake up in the middle of the night and struggle to fall back to sleep.  *Id.*  Once again, Kearson appeared pleasant, cooperative, alert, and oriented x3, with coherent and relevant speech and no impairment to insight and judgment.[3] *Id.*

---

[2] The PC PTSD is a screen designed for primary care and other medical settings currently used to screen for PTSD in veterans using Veteran Administration ("VA") health care. The PCL-C is a self-report measure reflecting DSM-IV symptoms for PTSD used by the VA to screen individuals for PTSD, aid in diagnostic assessments of PTSD, and monitor changes in PTSD symptoms.

[3] This language repeats itself throughout Dr. Ramos' reports about her appointments with Kearson. Substantially similar language about Kearson appears in notes written by Dr. Elaine Becher. R. 326, 343.

The next time Dr. Ramos saw Kearson was October 25, 2010. R. 503-06. Kearson reported that the medication put him to sleep, but that he still woke up in the middle of the night with nightmares and would talk and fight in his sleep. R. 503. He experienced paranoia and would check doors, windows, and blinds to make sure they were closed at all times. R. 504. He had a problem at work with another employee, had difficulty trusting other people, and just wanted to be left alone. *Id.* He was taking Wellbutrin in the morning and felt that it was helping to calm him down. *Id.* He was still positive for PTSD. *Id.* He reported extreme difficulty concentrating, working, taking care of tasks at home, and getting along with other people. R. 506. He indicated that he was willing to change his medication and take something for the nightmares. R. 504. He was prescribed terazosin for his nightmares. R. 503. On November 12, 2010, Kearson called Dr. Ramos and reported that the nightmares had not ceased. R. 499. Dr. Ramos advised Kearson to stop taking terazosin at that time. *Id.*

Dr. Ramos saw Kearson again on December 3, 2010. R. 496-97. Kearson reported that his nightmares had become more frequent and that the temazepam did not put him to sleep. R. 497. Kearson was still paranoid and requested to be referred to a sleep clinic. *Id.* The Wellbutrin kept him alert during the day and he reported no side effects from the medication. *Id.*

On December 29, 2010, Dr. Steven E. Gentry ("Dr. Gentry") saw Kearson in a consultation for insomnia requested by Dr. Ramos. R. 491-95. Kearson reported that he would invariably wake up two to three hours after going to sleep and had trouble getting back to sleep. R. 491. He reported that he would get sleepy during the daytime and would often fall asleep unintentionally. *Id.* He would also fight in his sleep and wake up at small sounds. R. 492. Dr. Gentry noted that Kearson had possible sleep apnea, inadequate sleep habits (particularly napping during the day), and that PTSD can interfere with sleep. R. 494. Dr. Gentry further

5

noted that Kearson's headaches (which Dr. Gentry believed to be tension headaches as opposed to migraines) could also interfere with Kearson's sleep. R. 495. Dr. Gentry ordered a diagnostic sleep study. *Id.* An overnight polysomnogram was performed on March 4, 2011, and showed the presence of obstructive sleep apnea. R. 457.

On February 3, 2011, Kearson reported to an emergency room complaining of a migraine headache lasting four days, fever, a sore throat, and a poor appetite. R. 481. Dr. Brian Rubenstein ("Dr. Rubenstein") diagnosed Kearson as having acute pharyngitis and a headache and prescribed Zithromax (to treat a possible strep throat) and Vicodin for any headaches not controlled by over the counter medications. R. 479-80.

Dr. Ramos again saw Kearson on April 4, 2011. R. 460-62. Kearson reported that he continued to have migraine headaches of increasing severity, which caused him to end up in the emergency room. R. 460. He stated that his migraines were worse when he was anxious and that he did not want to be around other people or socialize, preferring to be alone. *Id.*

On July 15, 2011, Kearson had a therapy session with Maureen D. Johnson, RN ("Nurse Johnson"), where he reported continued difficulty sleeping. R. 451. Kearson also met with Dr. Ramos that day and reported that his migraine headaches had "mellowed out" since he stopped taking Wellbutrin and switched to citalopram. R. 448. He reported sleeping better but that it took a while before he slept well. *Id.* He took hydroxyzine at least twice a day when he was anxious. *Id.*

On April 27, 2012, Kearson met with Dediosa E. Dimalanta, RN ("Nurse Dimalanta"), in relation to migraine headaches, low back pain, and poor sleep. R. 444-45. Kearson was scheduled to return to Afghanistan on May 14, 2012, and wished to be evaluated by his doctor

prior to departure. R. 445. Nurse Dimalanta told Kearson to go the ER when his headaches worsened. *Id.*

Dr. Ramos met with Kearson on April 30, 2012. R. 439-40. Kearson reported that he had been working in Afghanistan since October 2011 and had returned on April 19, 2012. R. 439. He reported that he was having problems sleeping, and that his migraine condition had worsened since coming back. *Id.* Additionally, he had a loss of appetite, continued to have nightmares, and felt jumpy all the time. *Id.* Dr. Ramos prescribed citalopram, tramadol meloxicam, and started Kearson on topiramate for his migraines. R. 440.

Dr. Ramos again saw Kearson on July 27, 2012. R. 433-35. Kearson reported that he lost his job as a contractor in Afghanistan due to his migraines and back pain. R. 434. He was taking cyclobenzaprine for the muscle spasm in his back, trazodone for sleep, and tramadol for leg pain. *Id.* The topiramate helped with his migraine headache and the citalopram helped with his depression. *Id.*

## C.    *Medical Record Following the August 1, 2013 Alleged Onset Date*

On September 4, 2013, one month after Kearson's alleged onset disability date, Kearson met with Elaine M. Becher, psychiatrist ("Dr. Becher") for medication management and supportive psychotherapy. R. 343-44. Kearson was still depressed, but experienced no side effects from his psychiatric medications, nor did he have any psychotic symptoms. R. 343. He reported that his main problem was back pain and inability to bend his right leg. *Id.* His mood was described as "stressed with a restricted range of affect," but his speech was coherent and relevant, he made good eye contact, his thoughts were well organized, and his insight and judgment were not impaired. R. 343. Dr. Becher increased the dosage of Kearson's citalopram, and continued his prescription of trazodone for sleep. R. 344.

Kearson saw Dr. Vidyasagar V. Modali ("Dr. Modali"), his primary care physician at the VA Medical Center, on November 1, 2013. R. 333-36. Dr. Modali noted that Kearson's back pain was controlled with medication and that his "intermittent flare up" migraines were resolved with Fioricet. R. 334. Kearson had no nausea, vomiting, or neurological symptoms. *Id.*

Kearson met with Dr. Becher on March 11, 2014, and reported experiencing no side effects from his medication. R. 325-26. Kearson was still feeling depressed at times. R. 325. His thoughts were well organized and he had no delusions or hallucinations. R. 326. His mood was stressed with a restricted range of affect, but his insight and judgment were not impaired. *Id.*

Kearson again met with Dr. Modali on April 10, 2014, for preventive care and health maintenance. R. 566-69. Kearson told Dr. Modali that he had requested a change of provider and that no action had been taken. R. 566-67. Dr. Modali ordered an MRI for Kearson's back at Kearson's insistence, and also ordered a neurology consultation for Kearson's migraine headaches. R. 568-69.

On May 9, 2014, Kearson was seen by Dr. Lloyd Hitchings ("Dr. Hitchings"), a VA Medical Center neurologist. R. 539-43. In conjunction with this consultation, Dr. Hitchings reviewed the results of Kearson's April 21, 2014 CT scan and found "[n]o CT evidence of acute intracranial infarct, hemorrhage or mass effect." R. 542. Further, Dr. Hitchings noted that Kearson reported occasional flare-up headaches that had progressed in frequency since 2004 or 2005. R. 539. Kearson advised such headaches were presently occurring three to four times per week and lasted from two hours to days. R. 540. Kearson reported that sitting in a dark room was helpful and that he had sensitivity to sound. *Id.* He also reported having visited an emergency room due to headaches (apparently in February 2011, as noted above) and that they caused him to leave early from, or miss entire days of, work. *Id.* Following the consultation, Dr.

8

Hitchings increased the dosage of Kearson's prescription for Topamax and also prescribed Imitrex. R. 542-43.

An MRI of Kearson's lumbar spine was performed on May 14, 2014 revealing, "moderate left neuroforaminal narrowing at L4-S1 secondary to disc disease." R. 579.

Dr. Hitchings saw Kearson for a follow up appointment on July 28, 2014. R. 585-86. At that time, Dr. Hitchings found that Kearson was "improved with his increased Topamax and [Imitrex] dosing." R. 586. He further reported that Kearson was "slightly vague as to the specific frequency [of his migraine headaches], but is overall improved." R. 586.

Kearson went to the emergency room on September 23, 2014 with a migraine headache. R. 574-77. He was given a ten-day refill of his medication, and instructed to see his neurologist as scheduled. R. 574.

**D.    *Veterans Administration Ratings Decision***

The Veterans Administration ("VA") issued Kearson's Rating Decision on July 25, 2013. R. 121. The VA found that Kearson was entitled to "individual unemployability" effective December 1, 2012. *Id.* His PTSD was increased from 50% to 70% disabling effective July 30, 2012. R. 122. The VA explained that Kearson's PTSD caused him difficulty in adapting to stressful circumstances, including work. R. 124. The PTSD also caused Kearson difficulty in establishing and maintaining effective work and social relationships. *Id.* Due to these difficulties, the VA found that Kearson experienced "occasional decrease in work efficiency," as well as "intermittent periods of inability to perform occupational tasks . . . ." *Id.* With respect to such matters, however, the VA also found that Kearson "generally" functioned "satisfactorily, with routine behavior, self-care, and [normal] conversation." *Id.*

The VA assigned Kearson a global assessment of functioning ("GAF") score of 55,[4] indicating moderate symptoms or any moderate difficulty in social, occupational, or school functioning. *Id.* The VA assigned a "0" level of severity to Kearson's memory, attention, concentration, executive functions, and judgment. R. 127. The VA examiner further found that Kearson's subjective symptoms of mild or occasional headaches and mild anxiety would not interfere with work, instrumental activities of daily living, or Kearson's relationships. R. 128. Finally, the VA examiner found that Kearson had no deficits in his oral and written communication skills. R. 128-29.

Kearson's migraines were downgraded from 30% to 0% by the VA, due to the declining frequency of such events. R. 122, 126. The VA also noted that a higher evaluation would have been warranted had Kearson experienced, on average, at least one migraine every two months over the preceding several months. R. 126. Kearson's vertigo was increased from 10% to 30% disabling. R. 122. Kearson's post-concussion syndrome was downgraded from 10% to 0% disabling, and his lumbar strain and thoracic spine strain was reduced from 20% to 10% disabling. *Id.* The VA found that Kearson had shown improvement in the severity of his traumatic brain injury symptoms. R. 217.

### E.   *Disability Determination Findings*

As part of Kearson's initial disability determination, Hillery Lake, M.D. ("Dr. Lake"), performed a psychiatric review technique analysis on April 22, 2014. R. 65-66. Dr. Lake found that Kearson had no restriction of activities of daily living, mild difficulties in maintaining social

---

[4] The GAF scale is a method of considering psychological, social, and occupational function on a hypothetical continuum of mental health. Am. Psych. Ass'n Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. 1994). The GAF scale does not directly correlate to the Commissioner's mental disorder listings, and a GAF score is not dispositive in the disability determination. 65 Fed. Reg. 50746-01, 50764-65 (2000).

functioning, mild difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of extended decompensation. R. 66. Dr. Lake found that none of Kearson's limitations rose to disabling severity. *Id.*

As part of Kearson's reconsideration, Jo McClain, Psy.D ("Dr. McClain"), performed a psychiatric review technique analysis on May 15, 2014. R. 75. Dr. McClain considered Kearson's migraines to be of primary priority, and his anxiety disorders to be of secondary priority. *Id.* Dr. McClain found that Kearson had no restriction of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of extended decompensation. *Id.* Dr. McClain found that none of Kearson's limitations rose to disabling severity. *Id.*

### F. *Testimony before the ALJ*

#### *(Samuel Nathaniel Kearson)*

At the administrative hearing on October 27, 2014, Kearson testified that he previously worked as a truck driver, a correctional officer, and was enlisted in the United States Army from December 2001 through June 2008. R. 34-37. Kearson testified that he worked for a defense contractor from 2008 to 2012 after his discharge from the Army, and that he left that job after the contract expired. R. 38.

Kearson testified that he experiences migraine headaches, often triggered by speaking loudly or thinking a lot. R. 44. When experiencing a migraine, Kearson has difficulty with bright lights, loud noises, and holding a conversation. R. 44. Kearson testified to experiencing migraines since 2004, but that the degree of the migraines has worsened since 2011. R. 43-44, 53. In this regard, Kearson testified that a migraine lasting five days sent him to the hospital in

February 2011. R. 44-45. He testified that medication helps somewhat, but he still experiences migraines, which can last all day, two to three times per week. R. 47-48.

When asked about his PTSD, Kearson responded that it causes him to stay at home rather than socialize outside his home. R. 50-51. He stated that he avoids interactions with other people because "they don't understand what [he's] actually going through." R. 51. He testified that he lives with his ex-wife and they share custody of a six-year-old child. R. 33-34, 55. He also testified that he has a high school education. R. 34.

*(Vocational Expert – Fred Monaco)*

At the hearing, the ALJ asked the testifying VE to determine if someone with Kearson's age, education, work experience, and residual functional capacity ("RFC") could perform Kearson's past relevant work. R. 58-59. The VE testified that such a person could not perform Kearson's past relevant work. *Id.* The VE then testified that such a person could perform other jobs that exist in significant numbers in the national economy, including pricing clerk, photocopy machine operator, and small product assembler. R. 59-60. The VE testified that an individual who is not able to maintain regular attendance or perform work on a regular sustained basis would be unable to perform work. R. 59. The VE stated that more than one day per month of interrupted attendance would be too high for most employer tolerances. R. 61. The VE testified that his responses were consistent with the Dictionary of Occupational Titles ("DOT"). R. 60.

## III. <u>THE ALJ'S DECISION</u>

To evaluate Kearson's claim of disability,[5] the ALJ must follow a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520, 416.920. First it must be determined if the claimant

---

[5] To qualify for DIB, an individual must meet the insured status requirements of the Social Security Act, be under the age sixty-five, file an application, and be under a "disability" as defined in the Act. "Disability" is defined, for the purpose of obtaining disability benefits, as the

is engaged in any substantial gainful activity. If he is, then the claimant is not disabled regardless of his physical or mental condition, age, education, or work experience. 20 C.F.R. §§ 404.1520, 416.920. Second, it must be determined whether the claimant has a medically determinable impairment that is severe or a combination of impairments that is severe. If not, then the claimant is not disabled. *Id.* Third, it must be determined whether the claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If so, then the claimant is disabled regardless of age, education, or work experience. *Id.* Before moving to the fourth step, the ALJ must first determine the claimant's RFC. An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. *Id.* At step four, if the claimant can perform the requirements of his past relevant work, then he is not disabled. At step five, the ALJ must determine whether the claimant is able to do any other work considering his RFC, age, education, and work experience. *Id.* The Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can perform. 20 C.F.R. §§ 404.1512(g), 404.1560(c), 416.912(g), and 416.960(c).

The ALJ found that Kearson met the insured requirements[6] of the Social Security Act through December 31, 2017, and he had not engaged in substantial gainful activity since August

---

inability to do any substantial gainful activity, by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. §§ 423(d)(1)(A), 416(i)(1)(A). To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy.

[6] To qualify for DIB, an individual must also establish disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act. *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

1, 2013, his alleged onset date of disability. R. 17. At steps two and three, the ALJ found Kearson had five severe impairments, PTSD, anxiety disorder, degenerative disc disease of the lumbar spine, obstructive sleep apnea, and headaches, but that these impairments did not individually or in combination meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, as required for a finding of disability at step three. R. 17-19 (citing 20 C.F.R. §§ 404.1520(c), 404.1520(d), 404.1525, and 404.1526). The ALJ found that Kearson's remaining impairments were non-severe because they did not exist for a twelve month continuous period, were responsive to medication, required no significant medical treatment, or failed to result in any continuous vocational, exertional, or nonexertional limitations. R. 17.

The ALJ next found that Kearson possessed a RFC to perform light work, as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b),[7] with the exception that he can "perform only occasional postural activity." R. 19. Additionally, the ALJ found that the claimant needs to "avoid concentrated exposure to loud noise, vibration, and hazards of any kind," and that the claimant is limited to "simple routine repetitive tasks with only occasional and superficial interactions with public and co-workers." R. 19. At step four of the analysis, the ALJ determined that Kearson was unable to perform any past relevant work, including work as a truck driver, corrections officer, and project manager, and that his RFC encompassed only the performance of unskilled light work. R. 23. Finally, at step five, after considering Kearson's age, education, work experience, and RFC, the ALJ found that there are other jobs (such as pricing clerk, photo copy machine operator, and assembler of small products) existing in significant numbers in the

---

[7] Light work is defined as requiring "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . . [A] job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

national economy that Kearson could perform.  R. 24.  Accordingly, the ALJ concluded that Kearson was not under a disability from August 1, 2013 through the date of the ALJ's decision and was ineligible for a period of disability and DIB.  R. 25.

## IV. **STANDARD OF REVIEW**

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence.  42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance of evidence.  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner.  *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456.  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)."  *Craig*, 76 F.3d at 589 (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)).  The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Perales*, 402 U.S. at 390; *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v.*

15

*Califano*, 611 F.2d 980, 982 (4th Cir. 1980)).   Thus, reversing the denial of benefits is appropriate only if either (A) the record is devoid of substantial evidence supporting the ALJ's determination, or (B) the ALJ made an error of law. *Coffman*, 829 F.2d at 517.

## V.  ANALYSIS

For the following reasons, the Court concludes that the Commissioner's finding is supported by substantial evidence.

### A.    The ALJ properly accounted for Kearson's impairments affecting his concentration, persistence, and pace in the RFC.

An administrative law judge must assess a claimant's work-related abilities on a function-by-function basis, including the functions listed in the regulations.  Social Security Ruling 96–8p, 1996 WL 374184, at *1 ("SSR 96-8p").  After doing so, the ALJ can express the RFC in terms of the exertional levels of work and the nonexertional limitations established by the evidence.  *Id.*   The RFC must include "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e.g.*, laboratory findings) and nonmedical evidence (*e.g.*, daily activities, observations)." *Id.* at *7.

In a recent decision, the Fourth Circuit further clarified the requirements of SSR 96-8p, holding that an ALJ does not account for a claimant's moderate limitations in concentration, persistence, or pace by limiting the RFC to simple, routine, or repetitive tasks. *Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015). *See also, Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011); *Stewart v. Astrue*, 561 F.3d 679, 684-85 (7th Cir. 2009) (*per curiam*); *Ramirez v. Barnhart*, 372 F.3d 546, 554 (3d Cir. 2004); *Newton v. Chater*, 92 F.3d 688, 695 (8th Cir. 1996). "As Mascio points out, the ability to perform simple tasks differs from the ability to stay on task.  Only the latter would account for a claimant's limitation in concentration, persistence, or pace." *Mascio*, 780 F.3d at 638.  In *Mascio*, the ALJ stated that he found

16

Mascio's claim that she suffered from a limitation in concentration, persistence, or pace on account of her pain to be "less credible" and accordingly did not include that limitation in the RFC or the ALJ's question to the vocational expert, without explaining whether he found it partially or completely incredible. *Id.*

*Mascio* did not adopt a *per se* rule requiring remand whenever moderate limitations in concentration, persistence, or pace are not included in the RFC. *Id.* at 637-38. Rather, *Mascio* allowed that the ALJ may explain why such limitations do not translate into a limitation in the claimant's RFC. *Id.* at 638. ("[T]he ALJ may find that the concentration, persistence, or pace limitation does not affect Mascio's ability to work, in which case it would have been appropriate to exclude it from the hypothetical tendered to the vocational expert."). Ultimately, the ALJ's opinion is required to provide enough analysis that a reviewing court is not "left to guess about how the ALJ arrived at his conclusions." *Id.* at 637.

Recognizing that *Mascio* does not create a *per se* rule, district courts in the Fourth Circuit have applied a case-by-case approach and considered remand inappropriate where the ALJ accommodates a claimant's actual limitations and the ALJ's decision considers all of the relevant evidence. *See, e.g., Hutton v. Colvin*, 2015 WL 3757204, at *3-4 (N.D.W. Va. June 16, 2015) (finding that *Mascio* is satisfied when the RFC is supported by substantial evidence and the ALJ considered all of the relevant evidence, explaining her reasoning); *Newcomb v. Colvin*, 2015 WL 1954541, at *3 (N.D.W. Va. Apr. 29, 2015) (finding that where the claimant did not cite any evidence that the ALJ failed to consider, the court was not left to guess at how the ALJ reached her conclusions); *Smith v. Colvin*, 2015 WL 1393339, at *3-4 (W.D. Va. Mar. 25, 2015) (finding that the ALJ fulfilled his *Mascio* obligation to explain how a claimant's mild to moderate limitations translate into an RFC for unskilled work because he discussed occasional

conservative mental health treatment for the claimant's anxiety, the state agency opinions recited that the claimant could perform unskilled work, and the GAF scores from the claimant's treating physician were indicative of mild to moderate symptom severity).

In *Mascio*, the Fourth Circuit cited to several other courts of appeals for persuasive authority, including the Eleventh Circuit's decision in *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176 (11th Cir. 2011). The Eleventh Circuit in *Winschel* stated that "when medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, courts have concluded that limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations." *Id.* at 1180. The Eleventh Circuit has also stated that when the medical evidence shows that a claimant can carry out unskilled tasks, the RFC "sufficiently accounts for [a claimant's] moderate limitation in maintaining concentration, persistence, and pace." *Hurst v. Comm'r of Soc. Sec.*, 552 F. App'x 522, 525 (11th Cir. 2013).

The ALJ concluded that Kearson has a moderate limitation in concentration, persistence, or pace (R. 18), and the ALJ has the burden of explaining why this limitation is not reflected in the RFC. SSR 96-8p. The ALJ explained his finding of a moderate limitation as follows:

> [w]ith regard to concentration, persistence, or pace, the claimant has moderate difficulties. The claimant reads and helps his son with homework (Exhibit 4E/6). Sometimes he has to be reminded to take his medication (Exhibit 4E/7). The claimant pays bills, counts change, handles a savings account, and uses a checkbook/money orders (Exhibit 4E/8). The claimant stated that he has difficulty following written instructions but he follows spoken instructions well (Exhibit 4E/10).

R. 18. These are the specific limitations that the ALJ must account for in his decision and the Court finds that he adequately did so.

18

First, the ALJ considered Kearson's mental health complaints and found reasons to doubt their severity. R. 21. The ALJ pointed out that Kearson helps his son with homework and that Kearson pays bills, counts change, handles a savings account, and uses a checkbook and money orders. R. 18. The ALJ noted that, in September 2013, Kearson reported his "main problem" to be back pain, rather than any mental health or concentration problems. R. 21, 343. The ALJ also identified a significant treatment gap in Kearson's mental health records from September 2013 to March 2014, a notable gap considering Kearson's alleged onset date of disability of August 1, 2013. R. 15, 21. The ALJ noted that Kearson has never had any side effects from his psychiatric medications, had no psychotic symptoms, and was neatly dressed and groomed, polite, cooperative, alert, and oriented x3 in his many appointments with Dr. Ramos. R. 21. The ALJ went on to point out that Kearson's speech was consistently coherent and relevant with normal rate and tone, his thoughts were well organized, and his insight and judgment were not impaired. *Id.* All of this evidence is relevant to Kearson's mental health, and much of it is relevant to Kearson's ability to concentrate while at work. While the ALJ may not have drawn the logical bridge as explicitly as might be preferred, the Court can readily ascertain the ALJ's reasoning.

Second, the limitation in the RFC to unskilled work[8] and simple, routine, and repetitive tasks does properly account for Kearson's actual impairments in this case. While a limitation to simple, routine, and repetitive tasks does not by itself address a limitation in a claimant's ability to stay on task, the specific impairments recognized by the ALJ in this case do not involve

---

[8] "Unskilled work is work which needs little or no judgment to do only simple duties that can be learned on the job in a short period of time . . . and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed." 20 C.F.R. § 404.1568(a).

Kearson's ability to stay on task. Rather, Kearson's impairments are that he sometimes needs to be reminded to take his medications and he has difficulty following written instructions.[9] These actual impairments are addressed by the simple, routine, and repetitive nature of the jobs that Kearson will be assigned because the nature of the work will diminish any difficulties due to Kearson's occasional forgetfulness, and negate the need for Kearson to follow written instructions on a regular basis. Further, as noted by the ALJ, Kearson is quite able to follow spoken instructions. R. 18. The RFC thus accounted for Kearson's actual impairments in this case.

The ALJ also engaged in a detailed discussion of Kearson's headaches. R. 21-22. While two to three debilitating migraine headaches a week would prevent Kearson from sustaining productivity for a full workday, the ALJ found these claims not credible. R. 21, 52. The ALJ noted Kearson's claim that the headaches began in 2004 or 2005. *Id.* The ALJ found this statement lacking in credibility because Kearson continued to serve in the Army until 2008, and then worked as a defense contractor in Iraq and Afghanistan between 2008 and 2012.[10] *Id.* The ALJ was also concerned that Kearson gave inconsistent statements about why he stopped working. *Id.* At the hearing, Kearson claimed that he stopped working because the contract had ended, but Kearson reported to the VA that he stopped working because of migraines, back pain, and sleep problems. *Id.* In the ALJ's determination, these inconsistent statements by Kearson suggested that the information he provided "generally may not be entirely reliable." R. 22. The

---

[9] This fact distinguishes this case from *Wedwick v. Colvin*, 2015 WL 4744389 (E.D. Va. Aug. 7, 2015). In *Wedwick*, the ALJ specifically acknowledged that the claimant was limited in her ability to *sustain* concentration, an impairment that would not be addressed by a simple, routine, and repetitive tasks limitation. *Id.* at *21.

[10] Even if the ALJ completely credited Kearson's testimony about the time when his headaches began, his ability to serve on active duty and then later work in war zones as a defense contractor casts doubt on the notion that Kearson was unable to do any work due to such condition.

task of making credibility determinations such as this one is not for this Court, but for the ALJ alone. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).

Additionally, the ALJ determined that the objective evidence as a whole did not support the severity of the symptoms that Kearson alleged. R. 22. He noted that Kearson's intermittent, migraine headaches were resolved with Fioricet in November 2013, and that his headaches were responding well to medication in July 2014. R. 21. Moreover, while noting that Kearson went to the emergency room in September 2014 for a migraine headache, the ALJ also observed that visit was promptly resolved by providing Kearson with a ten-day refill of his medications and he was thereafter discharged home. R. 21. The ALJ also noted that Kearson's treatment has been routine in nature and that Kearson has continually acknowledged improvement of his symptoms. R. 22. The ALJ also considered Kearson's activities of daily living, which consists of spending time with his son and helping him with homework, managing his own personal care, going outside every day, walking or driving, and shopping for entertainment items, to undermine the contention that Kearson's headaches were totally disabling. *Id.* In this way, the ALJ provided a logical bridge between the evidence and his conclusions.

Kearson argues that his PTSD limits his ability to stay on task, a limitation that should have been included in his RFC; however, Kearson does not point to any evidence that the ALJ failed to consider that could give rise to additional limitations not included in the RFC. ECF No. 10 at 19. While PTSD may very well lead to limitations in concentration, persistence, or pace, the ALJ explained why it does not in this case.[11] R. 23. The ALJ found that Kearson's medical records show that he is responding well to PTSD treatment and is relating well to others with a

---

[11] This renders this case similar to *Newcomb*, 2015 WL 1481625 (N.D.W. Va. Apr. 29, 2015). In *Newcomb*, the claimant alleged that the ALJ's decision was unsupported by substantial evidence, but did not identify any evidence that the ALJ failed to consider. *Id.* at 3-4.

goal oriented and logical thought process. R. 23. The ALJ discussed how Kearson's PTSD treatment is sporadic and conservative,[12] and that he has not sought crisis stabilization nor has it been recommended by a mental health professional. *Id.*

As noted above, the ALJ considered Kearson's testimony, and found that it suggested that his headaches affect his functioning more so than PTSD. *Id.* Indeed, at the hearing before the ALJ Kearson testified that his PTSD causes problems in his social interactions, but never testified that it caused limitations in his concentration, persistence, or pace. R. 50-51, 53. Based on this testimony, the ALJ limited Kearson's RFC to "only occasional and superficial interactions with public and co-workers." R. 19. In this way, the ALJ responded directly to Kearson's testimony about his limitations. It is therefore apparent to the Court that the ALJ considered the evidence regarding Kearson's PTSD, and properly explained why it resulted in the RFC limitation that it did, as opposed to a limitation in Kearson's ability to regularly attend work or stay on task when at work.[13]

Accordingly, because the ALJ's opinion and analysis was sufficiently detailed, the Court was not left to guess at the ALJ's reasoning. Additionally, the Court concludes that the ALJ has included all of Kearson's actual limitations in the RFC and considered all of the relevant evidence.

---

[12] An ALJ's consideration of the conservative nature of a claimant's treatment for an anxiety disorder was considered important in *Smith*, 2015 WL 1393339, at *4 (W.D. Va. Mar. 25, 2015).

[13] In his RFC determination, the ALJ also limited Kearson's "exposure to loud noise, vibration, and hazards of any kind." R. 19. This is another limitation based on both Kearson's headaches (which Kearson testified are exacerbated or triggered by loud noises (ECF 44)) and his PTSD, which may be triggered by events that startle him. This is another instance of the ALJ accounting for Kearson's actual, established impairments in the RFC.

**B.**     ***The ALJ's hypothetical to the vocational expert***
***properly accounted for all of Kearson's limitations.***

After the claimant makes a *prima facie* showing of disability, the burden then shifts to the

Commissioner to show that the claimant, considering his age, education, work experience, and

RFC, has the capacity to perform an alternative job that exists in significant numbers in the

national economy. *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981). The Commissioner shows this

by presenting vocational expert opinion testimony given "in response to hypothetical questions

which fairly set out all of the claimant's impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th

Cir. 1989). When the hypothetical question posed to the vocational expert does not include all of

the claimant's medically established impairments, grounds for remand exist. *Id.* at 51.

In this case, the ALJ posed a hypothetical to the VE that included all of Kearson's

limitations as they were reflected in his RFC. R. 59-60. Because, as discussed above,

substantial evidence supports the RFC determination, the hypothetical also "fairly set[s] out all

of the claimant's impairments." *Walker*, 889 F.2d at 50. Thus, the hypothetical posed by the

ALJ to the VE does not create grounds for remand.

**C.**     ***The ALJ appropriately addressed the VA ratings decision.***

Finally, although Kearson does not raise the Fourth Circuit's decision in *Bird v. Comm'r*

*of Soc. Sec.*, 699 F.3d 337 (4th Cir. 2012), as a reason for remand, the Court will briefly address

it, as well. In *Bird*, the Fourth Circuit addressed, for the first time, the weight that the SSA must

afford to a VA disability rating. After recognizing that both the VA and the SSA "serve the

same governmental purpose of providing benefits to persons unable to work because of a serious

disability," and further that "the purpose and evaluation methodology of both programs are

closely related," the court held that the SSA must give "substantial weight" to the VA disability

rating in making its own disability determination. *Id.* at 343. The court explained, however,

23

that, because "the SSA employs its own standards for evaluating a claimant's alleged disability" and "the effective date of coverage for a claimant's disability under the two programs will vary," the SSA need not give substantial weight to the VA disability rating when the record "clearly demonstrates" that less weight is appropriate. *Id.* *Bird* makes clear that the ALJ must either give the VA decision substantial weight or give a detailed explanation for refusing to do so. *Id*; *see also Wyche v. Colvin*, No. 4:13cv43, 2014 WL 1903106, at *10 (E.D. Va. Apr. 30, 2014) (finding that if an ALJ's opinion does not give substantial weight to the VA's rating determination, "then it must be evident from the opinion itself why the ALJ departed from that standard").

In this case, the ALJ gave great weight to the VA finding of 10% disability for back pain and great weight to the 0% disability rating for traumatic brain injury. R. 23. According great weight to these VA findings is consistent with *Bird's* mandate. *See Bird*, 699 F.3d at 343. The ALJ accorded little weight to the VA rating of 0% for headaches, finding that Kearson's headaches were suggestive of a severe, but not totally disabling impairment. R. 23. The ALJ adequately explained his reasoning for doing so. But, even if the ALJ erred, the error would be harmless. Kearson does not urge this Court to remand on the basis that the ALJ considered his headaches to be more severe than they actually are. Finally, the ALJ accorded moderate weight to the VA rating of 70% for PTSD. R. 23. The Court finds the explanation for the ALJ's departure from the substantial weight standard sufficiently detailed, such that it is clear to the Court why he departed from that standard. *See Wyche*, 2014 WL 1903106, at *10. The ALJ explained that Kearson's PTSD treatment has been sporadic and conservative in nature, and that Kearson has responded well to treatment. R. 23. The ALJ noted that no mental health professional has requested crisis stabilization, nor has Kearson sought crisis stabilization. *Id.*

Finally, the ALJ noted that most of the VA medical evidence pertains to Kearson's headaches, not his PTSD. *Id.* Upon consideration of the ALJ's explanation, the Court concludes that the ALJ did not err in assigning the VA decision moderate weight.

## VI. **RECOMMENDATION**

For the foregoing reasons, this Court recommends that plaintiff's motion for summary judgment (ECF No. 9) be DENIED, defendant's motion for summary judgment (ECF No. 12) be GRANTED, and the decision of the Commissioner be AFFIRMED.

## VII. **REVIEW PROCEDURE**

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(d) of said rules. A party may respond to another party's objection within fourteen (14) days after being served with a copy thereof.

2. A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

Robert J. Krask
United States Magistrate Judge

Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
April 28, 2016